UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Compressor Engineering Corporation,

     Plaintiff,

v.                             Case No. 09-14444

Manufacturers Financial Corporation, *et al.*,     Sean F. Cox
                                    United States District Court Judge

     Defendants.
_____/

## OPINION & ORDER
## GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS

     In an Opinion & Order issued on April 7, 2016, this Court certified this Telephone

Consumer Protection Act ("TCPA") case as a class action.   Discovery has closed and the matter

is now before the Court on: 1) Plaintiff's Motion for Summary Judgment; and 2) Defendants'

Motion for Summary Judgment.  The motions have been fully briefed and the Court heard oral

argument on the motions on September 7, 2017.

     As explained below, the law pertaining to TCPA cases has developed over the several

years during which this case has been pending before this Court.  It is now undisputed that

Defendants cannot be held liable for the offending faxes in this case on a strict liability basis.  In

order to prevail on the TCPA claims asserted against Defendants, Plaintiff and the Class must

establish, among other things, that the fax ads were sent "on behalf of" Defendants.  In a TCPA

decision issued on May 9, 2016, the Sixth Circuit set forth the multi-factor "on behalf of"

standard that the parties agree applies to the fax ads at issue in this case.

     As to Defendant Charity Marketing, LLC, there is no evidentiary basis for imposing

liability against that entity.  This Defendant is entitled to summary judgment as to the claims asserted by Plaintiff and the Class.

As to Defendant Richard Stephens (the individual who owns the two corporate Defendants), Plaintiff's Counsel acknowledges that there is no Sixth Circuit authority that supports Plaintiff's position that Stephens can be held personally liable under the TCPA. Several district courts that have addressed the personal-liability issue have concluded that individuals acting on behalf of a corporation may be held personally liable for violations of the TCPA where they had "direct, personal participation in or personally authorized the conduct found to have violated the statute."  But here, Plaintiff has failed to produce evidence that Stephens had such involvement.  Thus, Stephens is also entitled to summary judgment in his favor as to Plaintiff and the Class.

Finally, as to the remaining Defendant, the Court concludes that it is also entitled to summary judgment because Plaintiff and the Class cannot produce sufficient evidence at trial such that a reasonable jury could conclude that the two fax ads at issue in this case were sent "on behalf of" Defendant Manufacturers Financial Corporation.

Accordingly, the Court shall deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

## BACKGROUND

This case, filed in 2009, has a lengthy history that need not be repeated here.  This Court's April 7, 2016 Opinion & Order contains a broad overview of the case.  (D.E. No. 107). On April 7, 2016, this Court certified the following class in this TCPA case:

> All persons or entities who were sent one or more faxes on November 29, 2005, or November 30, 2005, that contained a "Remove" Hotline number of (718) 645-

2018, Ext 2234 and a "Complaint" Hotline number of (718) 645-2021, Ext 232. and offered either a "Limited Release Refinance Program" with a toll free number of (800) 264-3898 or a "Fast Track Approval for Licensed Brokers! [sic] that included contact information for Julia Kahn."

(*Id*. at Pg ID 3871).

The Sixth Circuit issued a TCPA decision, *Siding and Insulation Co. v. Alco Vending, Inc*., 822 F.3d 886 (6th Cir. 2016), on May 9, 2016. Plaintiff's counsel were aware of that decision, as class counsel Phillip Bock was also plaintiff's counsel in that case and was involved in the appeal.

This Court approved the class notice in this case in an order issued on June 6, 2016. Thereafter, a few class members opted out.

The Court held a Status Conference on September 13, 2016. At that conference, Plaintiff's counsel advised that the only additional discovery desired was the deposition of Caroline Abraham. On September 13, 2016, this Court issued an order that provided that Plaintiff's Counsel shall take the deposition of Caroline Abraham by December 14, 2016. (D.E. No. 124). The order also allowed the parties to file summary judgment motions by that date.

At the request of the parties, the Court later extended the date for filing summary judgment motions until May 2, 2017. (*See* 3/21/17 Minute Entry). Thereafter, both parties filed summary judgment motions. The motions reflect that Plaintiff's Counsel did not depose Caroline Abraham in this action, despite efforts to do so.

Plaintiff's Motion for Summary Judgment stresses that district courts often grant summary judgment motions in TCPA cases. The motion asserts that the evidence is "un-refuted" and that the Court should grant summary judgment "in favor of Plaintiff and the Class for the 14, 125 unsolicited fax advertisements Defendants sent to them," and "enter summary judgment in

favor of the Class and against Defendants in the amount of $7,062,500 in statutory damages for

Defendants' violations of the TCPA" and issue an appropriate injunction.

The body of Plaintiff's Motion for Summary Judgment contains the following argument

sections:

    A.     Defendants violated the TCPA
          1.     The faxes at issue are "advertisements" for Defendants; business
          2.     Defendants' fax advertisements were "unsolicited"
          3.     Defendants' advertisements were successfully sent by fax to
                 14,137 different telephone numbers
    B.     The Class is entitled to statutory damages under the TCPA
    C.     The Court should enjoin Defendants from sending unsolicited fax
          advertisements to Michigan consumers

(D.E. No. 140 at Pg ID 5711). Although the motion includes a sentence acknowledging that in

order to prevail Plaintiff and the Class must show that "Defendants' faxes were sent on their

behalf" (*Id.* at Pg ID 5715), and Plaintiff's Counsel was aware of the Sixth Circuit's decision in

*Siding & Insulation Co.*, and that its "on behalf of" standard applies to the fax ads at issue in this

case, Plaintiff's motion for summary judgment does not include a section on that issue. It does

not even cite *Siding & Insulation Co.* or discuss the standard of liability set forth in that case.

In opposing Plaintiff's Motion for Summary Judgment, Defendants stress that Plaintiff

did not depose Caroline Abraham in this case and that they presumably cannot produce her for

trial.

Defendants filed their own Motion for Summary, which asserts that all three Defendants

are entitled to summary judgment. Among other things, Defendants contend that, based upon the

Sixth Circuit's decision in *Siding & Insulation Co.*, Plaintiff and the Class cannot establish that

the faxes at issue were "sent on behalf of" the three Defendants (MFC, Stephens, and Charity

Marketing LLC).

The evidence produced by the parties is rather extensive, and includes all of the following.

**The Sole Named Plaintiff**

Plaintiff Compressor Engineering Corporation ("Plaintiff" or "Compressor") is the sole named Plaintiff and Class Representative in this case. It is undisputed that Compressor received a single fax ad, the one that it attached as an exhibit to the Complaint. (*See* D.E. No. 1 at Pg ID 11). As will be explained later, this is "Fax Ad Two."

**The Three Named Defendants**

There are three different named Defendants in this action: 1) Manufacturers Financial Corporation ("MFC"); 2) "Charity Marketing, LLC"; and 3) Richard Stephens.

**1.      Defendant Richard Stephens**

Defendant Richard Stephens ("Stephens") is an individual, who was the President and sole owner of MFC and Charity Marketing, LLC.

**2.      Defendant MFC**

MFC was a Michigan corporation and Stephens was its sole shareholder, President, and Treasurer throughout its duration. (Stephens Dep. at 8-9). MFC had two locations, Farmington Hills and Grosse Pointe, Michigan. (*Id*.). MFC was a financial company that offered residential and commercial mortgages. (*Id*. at 10). Stephens testified that MFC began in 1991 and operated until 2007 or 2008. (*Id*. at 9).

Stephens testified that all advertising at MFC was supposed to go through him. (Stephens Dep. at 22).

It is undisputed that MFC employed Julia Kahn and Larry Brundage as loan officers and

account executives and that MFC's telephone numbers were (248) 427-0800 and (248) 427-9800 (a fax line). (D.E. No. 144 at Pg ID 6193). Stephens testified that Kahn "wasn't an ad man, she was just a loan officer." (Stephens Dep. at 53). Stephens testified that MFC itself did not engage in fax marketing. (Stephens Dep. at 36).

Stephens testified that he does not recall: 1) him or anyone else at MFC communicating with a fax marketing company to send fax ads on behalf of MFC; 2) having communicated with someone named Kevin Wilson; or 3) any communications with a company called B2B in New York regarding fax advertising. (Stephens Dep. at 40-41). Stephens does not recall anyone at MFC having authorized Kahn to work with Charity Marketing Services, LLC to create a fax advertising campaign. (*Id*. at 71).

Stephens testified that MFC "engaged marketing companies," such as Charity Marketing Services, LLC, and those marketing companies "could have had a fax campaign." (*Id*. at 37).

Stephens recalls that Charity Marketing Services, LLC did some "lender to broker industry" faxes, wherein it faxed "rate sheets" to brokers. (*Id*. at 38-42).

Stephens testified that he does not recall ever having employed a person named Jim Busch or Joseph Busch. Stephen does not recall the name Joseph Busch as anyone he ever communicated with. Stephens does not know if Charity Marketing Services, LLC or Ernie Feigelman employed a person by that name. (Stephens Dep. at 32, 38-39, 48, 56, 57).

### 3.     Defendant Charity Marketing, LLC

Stephens also owned and operated Charity Marketing, LLC. (Stephens Dep. at 13-16). During the 2005-2006 time period, that entity engaged in marketing services, specifically direct mail and telemarketing. (*Id*. at 13).

The entity was located in Farmington Hills, Michigan and had its own bank account, at Metrobank. (*Id*. at 14). Stephens testified that Charity Marketing LLC did not have a bank account at Flagstar bank, and Stephens was the only person authorized to sign checks for the entity. (*Id*. at 14-15). The entity performed work for MFC (*Id*. at 24), had no employees and hired independent contractors. (*Id*. at 14). It is undisputed that Charity Marketing, LLC never operated under the name Charity Marketing Services, LLC. (D.E. No. 144 at Pg ID 6193).

Stephens testified that Charity Marketing, LLC never performed any fax campaigns that utilized fax blasts. (Stephens at 84).

**Cast Of Other Characters – None Of Whom Are Parties**

There are other persons and entities that were involved in the events surrounding the fax ads at issue in this case.

### Yuliya Kahn

Non-party Yuliya Kahn was hired by Stephens as a loan officer for MFC. (Kahn Dep. at 14-16). Kahn's native language is Russian and when Stephens hired her, Kahn's "social skills and language skills were very limited." (*Id.* at 20). Kahn worked exclusively with residential mortgages (*Id.* at 11) and was hired at MFC to obtain residential mortgage business from her friends and family in the Russian community in Michigan. (*Id.* at 20).

Kahn testified that she "created flyers for" MFC and that Stephens "saw my flyers." (*Id.* at 22). Kahn testified that she does not recall if Stephens approved of the flyers or the language or descriptions she put in them, but also testified that she would not have created a flyer without his approval. (*Id.* at 22). Kahn testified that she created such "flyers" while working at MFC and mailed them to her friends and family, and passed them out in neighborhoods. (*Id.* at 21).

Kahn did other advertising for herself while employed by MFC, such as putting her own ad in the "Yellow Russian Pages." (*Id.* at 22)

Kahn testified that all the advertising she did was with the knowledge and approval of Stephens. (*Id.* at 23). But Kahn testified that her work "wasn't so much advertisement as you think," explaining that she did two or three flyers and "that was it. It wasn't a big campaign." (*Id.* at 23). As to her flyers, Kahn testified: "[s]o if I sent it to anybody, I usually had to talk to someone to get the fax number or e-mail address or anything, or mail address." (*Id.* at 23).

Kahn testified: "I was never involved in any marketing with anybody but my Russian single people." (*Id.* at 28). Kahn testified that she does not know if MFC engaged in fax advertising:

> Q. Okay. At any point in time while you worked at Manufacturers Financial had they or did they engage in fax advertising?
> A. I can't remember that. And I wouldn't even know, probably, even if they did.

(Kahn Dep. at 33-34). Kahn further testified that she does not have any recollection of having spoken to or corresponded with a fax marketing company in New York, or a marketing company by the name of Business to Business Solutions, or a company named Maxileads or Macaw. (*Id.* at 32).

Kahn testified that she was not "someone who was involved in anything that had to do with the company. I was pretty much working for myself." (*Id.* at 32-33). Kahn further testified:

> Q. Okay. Did you, from time to time, follow up on interaction with marketing or advertising companies that Mr. Stephens asked you to call or follow through and communicate with?
> A. No. He would never ask me. At that time my English wasn't even that good.

Q. Okay.

A. They wouldn't understand what I'm saying.

Q. Okay.

. . . .

Q. While you were working at Manufacturers Financial did Manufacturers Financial ever purchase lists of names or telephone numbers?

A. I don't remember. And again, I wasn't involved, so they wouldn't tell me what they do.

Q. During the period of time that you worked for Manufacturers Financial did Manufacturers Financial maintain a database of names and phone numbers or fax numbers of people that they were - had contracted or were hoping to contact about their lending products?

A. It wasn't available to me it they did. I have no idea.

Q. Do you know of or have ever worked with anyone at Compressor Engineering?

A. No. Is a Russian person there? Maybe it's somebody Russian there, then, you know, they could have contacted me, but other than that, I wouldn't know who they are.

(*Id*. at 33-34).

During her deposition, Kahn was shown various documents provided to Plaintiff by Abraham and Kahn testified that she does not remember seeing the documents, that she has "no idea who Kevin Wilson is," and that the handwriting on most of the documents does not look like her handwriting. (*Id*. at 36-49).

**Caroline Abraham, B2B, And Macaw**

Caroline Abraham, and two businesses she was associated with, are central to the events in this case, and scores of others.[1]

Abraham operated a fax advertising business that catered to small businesses. *See Bridging Communities, Inc. v. Top Flite Fin. Incorp*., 843 f.3d 1119, 1122 (6th Cir. 2016).

---

[1]*See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 491 (7th Cir. 2013), which contains a detailed description of how scores of "B2B junk fax" cases originated through Abraham and B2B.

Abraham's Declaration[2] states, "Business to Business ('B2B') is a d/b/a of mine that was involved in the sending of fax advertising from approximately August 2005 until September 2007." (Abraham Decl., D.E. No. 139-7 at Pg ID 5501).

"B2B assisted a Romanian business, Macaw, S.R.L." ("Macaw") and "Macaw was directing fax broadcasting." (Abraham Decl., D.E. No. 5501). B2B and Abraham provided a variety of services to Macaw relating to fax broadcasting.

Abraham described how Macaw and B2B's customary business operations regarding fax-blasting were conducted. (D.E. No. 139-7 at Pg ID 5504). "First, Macaw sent its own fax advertisements to thousands of businesses in an effort to offer to them fax broadcasting services." Second, after a potential customer expressed interest, some pertinent information would be collected an assembled. (*Id.*). "We would request information from customers by providing a form through fax correspondence that said, 'tell us what to write in your free ads,' and they would provide us with their pertinent information on that form." (*Id.*). "Third, using the customer's provided information, one or more advertisements would be designed and drafted by Macaw and myself and sent to the customer" and "[c]ustomers typically made some revisions before approving the final form and content." (*Id.*). "Fourth, the advertisement would be finalized and approved, and payment or promise of payment would be requested and received before the fax-campaign would begin." (*Id.*). "Fifth, I would instruct Macaw's computer and database operators about how to construct the fax list to conduct the campaign in accordance

---

[2]The parties dispute whether Abraham's Declaration can be considered for purposes of summary judgment, given that she likely will not testify at trial. The Court need not address that argument because, even when considered, the Court concludes Defendants are still entitled to summary judgment.

with stated customer requests and directives." (*Id.*). "Sixth, after receiving my instructions based on customer requests, Macaw's computer technicians (e.g., Ionut and Adrian) would follow those instructions to compile the fax lists from the database once purchased from InfoUSA. Then, the customer's fax would be sent to that list using B2B's computer system with the HylaFax program." (*Id.*).

### Non-Party Charity Marketing Services, LLC

Stephens testified that MFC worked with a marketing company called Charity Marketing Services, as well as other marketing companies. (Stephens Dep. at 25). As to Charity Marketing Services, Stephens testified "that's not my entity" and believes that Ernie Feigelman owned that entity. (*Id.* at 25-26). Stephens testified that Charity Marketing Services provided marketing to MFC. Specifically, that entity provided MFC with mortgage leads. Stephens cannot recall if MFC had a contract with Charity Marketing Services. (*Id.*).

Stephens testified that the only thing he ever paid Charity Marketing Services for was if it produced an actual mortgage lead for MFC. (Stephens Dep. at 83). He further testified that he did not know the operation of that business and that they could have been performing their own unsuccessful marketing without his knowing about it. (*Id.* at 83-84).

It is now undisputed that Charity Marketing Services, LLC is an entity formed and owned by Larry Brundage (who is now deceased) and that Arnold Feigelman helped manage it. (*See* D.E. No. 144 at Pg ID 6190-91). Charity Marketing Services, LLC lists Feigelman as its registered agent and an address of 15075 Lincoln Apt. 229 Oak Park, MI. 48237. (*See* D.E. No. 137-9 at Pg ID 5235). It is undisputed that Charity Marketing Services, LLC had a bank account at Flagstar Bank and that Brundage and Feigelman were the only persons authorized to write

checks on that account.  (D.E. No. 144 at Pg ID 6191).

**Joseph Busch And Kevin Wilson**

Documents produced by Abraham to Plaintiff's Counsel include documents referencing a "Kevin Wilson" who is identified as being associated with "Maxileads" or Macaw. Abraham's Declaration asserts that a "Joseph Busch" was somehow associated with either Charity Marketing Services, LLC or MFC but does not specify which entity.  There are no affidavits, declarations, or deposition transcripts from Wilson or Busch.  The parties have provided no evidence establishing who Busch or Wilson worked for or what work they did.

**Defendants' Interrogatory Responses**

During discovery, Defendants submitted "Defendants' Answers to Plaintiff's First Set of Interrogatories" that were answered by "Richard K. Stephens, President/CEO of Manufacturers Financial Corp. and Managing Member of Charity Marketing, LLC, with assistance of counsel." (D.E. N. 139-6 at Pg ID 5492).  Those Answers included:

> 2.    State whether defendant, or any other entity acting on defendant's behalf, has utilized facsimile transmissions delivered by telephone during the Relevant Time Period which either (1) were used for any advertising or promotional purpose, or (2) which advertised any property, good or services, and describe in detail the content of each document sent by such transmissions and the time period each different document was sent.

> ANSWER:    At some point while the defendant corporations were still in existence, defendants briefly utilized the services of some third party company to perform a marketing campaign on behalf of defendants.  Defendants do not recall the name of this third party. At that time, the third party represented that it had permission/authorization to contact individuals as part of its marketing campaign.  Facsimile transmissions may or may not have been part of this marketing campaign.

> 10.    Fully identify each and every person who participated in defendant's decision to send facsimile transmissions identified in Interrogatory 2, and

12

state the extent and substance of each person's participation therein.

ANSWER:     Julia Kahn, former loan officer, was in contact with the unknown third party. Ms. Kahn's whereabouts and contact information was unknown to defendants.

22.     If any entity other [sic] an defendant operated the equipment used to send any facsimile transmissions to 3113-4912766 on behalf of defendant, state the name, address, and telephone number of each such entity, identify how defendant became aware of each such entity, and describe in detail the contents of all communications between defendant and each such entity.

ANSWER:     Defendants do not recall the name of the third party but do recall that the third party was brought to its attention by former employee, Julia Kahn.

23.     If you contend that any other entity or individual should be responsible for the actions complained of in this lawsuit, fully identify each such entity or individual and state all facts supporting such contention or regarding the entity's or individual's role in the action complained of in this lawsuit.

ANSWER:     Defendants sent no facsimile transmissions. Defendants authorized some third party to perform a marketing campaign on defendants' behalf within their network. The third party represented that they had permission/authorization to conduct marketing with a select group of potential clients.

(*Id.* at Pg ID 5492-94 & 5497).

**Declaration from Stephens**

Defense Counsel submitted a Declaration from Stephens. (D.E. No. 137-12). In it, Stephens states, "I personally had no knowledge of and nothing to do with the fax campaign at issue in this lawsuit." (*Id.* at ¶ 17). Stephens further states:

11.     When I answered plaintiffs' interrogatories, the only information I had was the B2B documents produced in this action (Exhibit 25). We were in possession of Khan Exhibits 2 and 21 which purportedly show Julia Khan sending faxes to a Kevin Wilson who is an unknown "third party." Julia Khan subsequently denied knowledge of these documents at her deposition dated April 18, 2012. I had no knowledge of these documents before the litigation.

*(Id.* at ¶ 11).

Stephens states "I was never informed that Julia Khan or Larry Brundage was in contact with 'B2B'" and neither Khan nor Brundage had authority to send out materials on behalf of MFC without his approval. (*Id*. at ¶ 5& 9).

Stephens states that MFC would buy "leads" from Charity Marketing Services, LLC, and that Charity Marketing Services was also free to sell leads or provide marketing services to others. (*Id*. at ¶ 7).

Stephens states that, from time to time, he authorized Charity Marketing Services, LLC to send out MFC's "rate sheets" on a "broker to broker" or "industry to industry" basis. (*Id*. at ¶ 8). Stephens states that "[a]ll such rate sheets were to go to businesses we had done business with" and that Brundage "assured me he was in compliance with all laws governing this activity." (*Id*.).

Stephens states that when he answered "Interrogatories 2, 20, 16, and 23," he was referring to Charity Marketing Services as the third party who was authorized to send faxes within its network. It was "only through discovery in this lawsuit that I learned that B2B was involved. I did not authorize Larry Brundage to retain B2B to wage a fax campaign on behalf of myself, Manufacturers Financial Corporation or Charity Marketing, L.L.C. If he did that, he did it solely on behalf of" Charity Marketing Services, LLC. (*Id*. at ¶ 12).

**Declaration from Abraham**

Plaintiff submitted a Declaration from Caroline Abraham, dated February 13, 2014 that states, in pertinent part, that: 1) "Manufacturers Financial Corp. and *Charity Marketing Services, LLC, through Joseph Busch* and Julia Kahn, hired, authorized and paid B2B to send out

advertisements on their behalf," 2) "Manufacturers Financial Corp. and Charity Marketing Services, LLC, through Joseph Busch and Julia Kahn, provided B2B with the information they wanted written in the fax advertisement and worked with B2B to finalize the fax advertisement before delivery," and 3) Manufacturers Financial Corp. and Charity Marketing Services, LLC, through Joseph Busch and Julia Kahn, approved the form of the final fax advertisement and paid B2B $598.00 to send out over 20,000 fax advertisements on its behalf." (D.E. No. 139-5 at Pg ID 5446-47) (emphasis added).

"Charity Marketing Services, LLC" is not named as a Defendant in this case.

**Documents Provided By Abraham And Produced By Plaintiff**

The records that Plaintiff's Counsel states that they obtained from Caroline Abraham consist of several documents and various versions of fax ads, some with unidentified handwriting on them.

One of those documents is a communication from "Kevin Wilson" at "MaxiLeads, Macaw, Inc. – Business to Business Solutions, Agent" to "Joe Busch" with "Client Number: J102007" listed and stating:

Following, find one of more sample ads written for your business.

Select the ad you like best. If needed, make corrections, additions, or changes on the selected fax itself and fax it back to use immediately at (800) 871-4211.

If the selected ad already meets with your approval, please write "Client Number: J102007 – Ad Ok," on it and fax the approved ad back to us! We will call you to make the final arrangements for your advertising campaign.

(D.E. No. 139-4 at Pg ID 5420).

Another document produced by Plaintiff, via Caroline Abraham, is a "Free 'Ad Details' Form" that states:

> For a FREE, professionally written, powerful, and effective advertising piece:
> • You are under no obligation whatsoever
> • Please complete this form, even if you attach additional details
> • Fax it to (800) 871-4211
> • You may add your own ad(s), other ad(s), additional notes, or suggestions
> • We will not send your ad without your approval

(D.E. No. 139-4 at Pg ID 5414). The form then has blanks that can be filled in and this one indicates it was filled out by "Joseph Busch," list the company name as Manufactures *Mortgage* Corp., and lists "Client Number: J102007." (*Id.*) (emphasis added). This form has, in handwriting, the "three main 'selling points' of your product or service:" 1) Bad credit, 2) Lower Bills / Cash out, and 3) Lower House Payment. It indicates it is "Page 3 of 3," but the first two pages are not included.

Another document provided by Abraham is a one-page communication from "Kevin Wilson," with a header indicating it is from "Maxileads" and/or "Macaw, Inc – Business to Business Solutions, Agent." (D.E. No. 139-5 at Pg ID 5485). That documents states "Attention: Julia Kahn" and states "Welcome aboard: We now have everything needed to start your faxing campaign, except payment" and instructs how to authorize the sending of the "20,000 fax ads" that it pertains to:

> STARTING YOUR CAMPAIGN:
> * Write a check payable to "Business to Business Solutions:
> * In place of your signature write the word "Void"
> * Write the "Client" Number (J102007) in the "memo field"
> * Make a copy of this check
> * Fax the check copy to (800) 871-4211
> . . . .
> * Unless you tell us to wait, *your campaign begins upon our receipt of your faxed check copy*

(*Id.*) (emphasis added).

The documents provided by Abraham indicate that those instructions were followed, and

that the check that authorized B2B/Macaw to send the faxes at issue in this case came from

Charity Marketings Services, LLC – not from any of the Defendants named in this action.

Among the records that Plaintiff's Counsel obtained from Caroline Abraham are two

versions of checks made payable to Business to Business Solutions. (D.E. No. 139-4 at Pg ID

5431 & 5442). The handwritten one (Pg ID 5431) states it was issued on 11/28/05, in the

amount of $598.00 for "Client # J102007." It was written on the account of Charity Marketing

Services, LLC with an address of 15075 Lincoln St. Apt 229 in Oak Park, Michigan. It has

"void" written on the signature line. It is undisputed that the handwriting on this check is that of

Brundage. (D.E. No. 144 at Pg ID 6192).

The other version of the check (Pg ID 5442) is dated November 29, 2005, from "Charity

Marketing Services, LLC" with an address of 15075 Lincoln St. Apt. 229 in Oak Park,

Michigan, made payable to "Business to Business Solutions." The check indicates the account is

with Flagstar Bank. The amount of the check is $598.00 and the memo line of the check reads

"Client #J102007 – for 2 fax blasts." The signature line says "This draft authorized by your

depositor, No Signature Required."

**The Fax Ads Sent**

The parties agree that the two fax ads that were sent in this case are found at: 1) D.E. No.

139-4 at Pg ID 5443 (Exhibit 23 to the Kahn Dep.); and 2) D.E. No. 139-4 at Pg ID 5444

(Exhibit 24 to the Kahn Dep.) (*See* D.E. No. 144 at Pg ID 6189 wherein parties so stipulate).

**Fax Ad One**

The first fax ad ("Fax Ad One") has "Manufacturers Financial Corporation" in large

letters at the top. It states "Fast Track Approval for Licensed Brokers!", has a star burst

17

containing "100% LTV 580 Fico Special," and has the following bullet points:

- 580 FICO, 100% Full Doc Only
- 620 FICO, 100% Stated
- Max DTI 50%
- No MI
- O x 30 MTG/Rent
- BK – must be discharged
- O/O SFR, PUD, condos, 2 units
- 2 month PITI reserves required for 80/20 loans

(*Id.*).  It states, in large letters, "WE ARE ONE STOP SUB-PRIME LENDER" and then lists the

following:

Julia Khan – Account Executive
Office 248-427-0800 ext. 202
Cell 248-345-3390
Fax 248-769-6059
Email Juilia@manumortgage.com

(*Id.*).  At the bottom of the fax, it includes a lengthy paragraph that includes the following: "This

message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Bue, Rom,

050183, 40723294564, which is solely responsible for its contents and destinations."  (*Id.*).

Richard Stephens's name does not appear in Fax Ad One, nor does the name of Charity

Marketing, LLC.

**Fax Ad Two**

The second fax ad ("Fax Ad Two") has a cartoon image at the top, with a woman saying

"PSSST . . .  Check out for the Great Residential and Commercial Lending Below" and then

says, in large letters, "Limited Release Refinance Program."  (D.E. No. 139-4 at Pg ID 5444).  It

then says:

The 1% Mortgage Payment for 37 states

Residential                                  Commercial

18

| » Refinance | » Apartments |
| » Pay Off Debt | » Offices |
| » Lower Payment | » Strip Malls |
| » 2nd Mortgages Fixed | » LTVs up to 90% |
| » Home Improvement | » $100,000 to $50,000,000 |
| » Cash Out! | |

(*Id.*).  It then lists various loan amounts, next to payments.  It also says "99% of Refinance Applicants Will Qualify.  We Love Bad Credit!  Free No Obligation Quotes" and states "For Details, Call (800) 264-3898, Ext 340."  (*Id.*).  Like the other ad, at the bottom it states "This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Bue, Rom, 050183, 40723294564, which is solely responsible for its contents and destinations."  (*Id.*).

The names of Richard Stephens, MFC, and Charity Marketing, LLC do not appear anywhere in Fax Ad Two.

It is undisputed that the telephone number (800) 264-3898 – the one featured in Fax Ad Two – was not a number for either MFC or Charity Marketing, LLC.  (D.E. No. 144 at Pg ID 6198-99).

**The Sending Of The Faxes**

It is undisputed that B2B sent the faxes at issue in this case to "fax numbers generated through a target list acquired by B2B from a third-party vendor, InfoUSA." (D.E. No. 139 at Pg ID 5329).  It is also undisputed that "Defendants did not provide B2B with the list of contacts to receive the fax advertisements," and "Defendants did not create the list of fax ad recipients." (*Id.*).

Rather, that was all done by Abraham/B2B or Macaw.  (*Id.*; Abraham Decl., D.E. No. 139-7 at Pg ID 5505).  It is undisputed that B2B – the entity whose business was dedicated to performing fax-blast advertising services for others –  "did not contact Plaintiff or any

19

companies or persons on the InfoUSA list for express permission or invitation to receive fax advertisements." (D.E. NO. 139 at Pg ID 5329).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## ANALYSIS

### I. Defendants Are Entitled To Summary Judgment In Their Favor.

In their motion, Defendants direct the Court to *Siding & Insulation Co.* and contend that the Court should grant summary judgment in their favor because Plaintiff cannot show that the fax ads in this case were "sent on behalf" of Defendants.

In response, Plaintiff's Counsel agrees that, based on the date on which the faxes at issue in this case were sent, the "on behalf of" standard set forth in *Siding & Insulation Co.* applies. (*See* D.E. No. 143 at Pg ID 6176). Plaintiff argues, however, that "does not change the outcome in this case where the record shows the faxes were sent on behalf of MFC and Stephens." (*Id.*).

As with many aspects of TCPA cases, the law has changed over time, as the Sixth Circuit has issued decisions on the TCPA. It is now undisputed that Defendants cannot be held liable for the offending faxes in this case simply because their goods or services may have been

advertised in the faxes.

In order to prevail on the TCPA claims asserted against Defendants, Plaintiff must establish, among other things, that the fax ads were sent "on behalf of" Defendants. In *Siding & Insulation Co.*, issued on May 9, 2016, the Sixth Circuit set forth the "on behalf of" standard that the parties agree applies to the fax ads at issue in this case. Liability for sending the faxes in this case must be "judged by that standard." *Id.* at 898. Notably, *Siding & Insulation Co.* was also a B2B junk fax case.

In that case, the Sixth Circuit explained that "[t]o decide whether one entity (such as B2B in this case) broadcast a potentially unauthorized fax 'on behalf of' another entity (such as [Defendants] in this case), courts have considered a variety of factors" which "include the degree of control that the latter entity exercised over the preparation of the faxes, whether the latter entity approved the final content of the faxes as broadcast, and the nature and terms of the contractual relationship between the fax broadcaster and the latter entity." *Id*. at 898. It noted with approval that another court had summarized the "on-whose-behalf" inquiry as follows:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

*Id*. (citing *Cin-Q Auto*, 2014 WL 7224943, at *7).

In adopting this "on-whose-behalf" standard of liability for TCPA junk-fax cases, the Sixth Circuit explained that:

> These courts have applied the above-described factors with an eye toward

21

Congress's intent in passing the fax-related provisions of the TCPA. In particular, Congress intended to stop fax advertisers from (1) coopting advertisement recipients' fax machines in a way that interferes with legitimate business uses, and (2) shifting advertising costs from the sender of the fax to the recipient of the fax. *Palm Beach Golf Ctr.*, 781 F.3d at 1257. Courts have therefore applied the "on-whose-behalf" standard in a way that targets the entity primarily responsible for such conduct. *Id.* (approving the "on-whose-behalf" standard because it "place[s] liability at the source of the offending behavior that Congress intended to curtail"); *see also Cin-Q Auto.,* 2014 WL 7224943, at *7 (observing that the "on-whose-behalf" standard is "aimed at establishing the origin of the offending behavior"). These courts accordingly do not apply the "on-whose-behalf" standard with a layperson's understanding of what that phrase might mean; instead, they treat the phrase "on whose behalf" as a term of art that should be interpreted in a way that seeks to hold liable the entity ultimately at fault in causing a TCPA violation.

Based on the foregoing, the phrase "on-whose-behalf" has been treated as a term of art that blends (1) federal common-law agency principles, such as whether and to what extent one entity controlled the other, and (2) policy considerations designed to address which entity was most culpable in causing a TCPA violation, such as whether and to what extent each entity investigated the lawfulness of the fax broadcasts at issue. We agree that this interpretation of the "on-whose-behalf" standard effectuates Congress's intent in passing the TCPA. Accordingly, we now adopt this interpretation and apply it to the present case.

*Id*. at 899.

In that case, the district court had granted summary judgment in the defendant's favor, because it did not have vicarious liability for the faxes sent by B2B. The district court also denied the class certification motion as moot. The Sixth Circuit reversed the district court's summary judgment ruling and remanded for the district court to apply the "on-whose-behalf" standard.

The Sixth Circuit did that, even though discovery had closed and even though it had evidence before it relating to the factors to be considered.

The Sixth Circuit concluded that some of the factors to be considered "tended to show" that B2B did not act on behalf of the defendant, explaining:

Several of the factors identified in cases such as *Palm Beach Golf Center* and *Cin–Q Automobiles* indicate that B2B did not act on Alco's behalf. First, Gajdos testified during his deposition that B2B never provided any details about the list of fax numbers to which it intended to send the faxes advertising Alco's services. Gajdos added that Alco never received information from B2B about the numbers or businesses to which the faxes actually were transmitted. Alco therefore had only limited "access to and control over facsimile lists and transmission information," *see Cin-Q Auto.,* 2014 WL 7224943, at *7, with the implication that B2B—rather than Alco—was the entity responsible for sending the faxes to businesses that had not consented to the receipt of the advertisements.

Second, Gajdos testified that, when he received complaints from businesses to which the faxes had been sent, he would call Wilson and notify him of the complaints. According to Gajdos, Wilson then stated that he "would have to take [the businesses] off his list" and promised that "he would take care of it." This exchange demonstrates that Alco took "measures ... to ensure compliance and/or to cure non-compliance with the TCPA," *see id.* at *7, because any violations that occurred after Gajdos's communications with Wilson could reasonably be attributed not to Alco's conduct, but to B2B's failure to carry out Wilson's promises. B2B in these circumstances was thus potentially responsible for any further TCPA violations that may have occurred.

Next, B2B assured Gajdos that any advertising that B2B conducted would be "100 percent legal" because "[B2B] had a full and open relationship" with each of the potential advertisement recipients. A factfinder could conclude that Alco reasonably relied on these representations in deciding to enter an advertising arrangement with B2B that Alco believed would not violate the TCPA or any other laws. And that, in turn, would mean that B2B, rather than Alco, was the actual origin of any conduct that violated the TCPA. *See id.* at *8 ("A reasonable jury could conclude that [the defendant] relied on reasonable assurances by [the fax broadcasters].... Such an analysis could lead a rational trier of fact to conclude that the violative faxes were not sent on behalf of [the defendant] but, rather, [the fax broadcasters]—the true sources of the offending behavior.").

Finally, the sample advertisements that Wilson sent to Alco included a legend stating that the message was "the exclusive property of Macaw ..., which is solely responsible for its contents and destinations." Similarly, the letter that B2B later sent to Alco stated that B2B, rather than Alco, was "solely responsible for the contents and destinations of [the] faxes." These representations could be viewed by a factfinder as tending to show that Alco lacked any significant "input and control over the content of the fax(es)," *id.* at *7, thereby implying that B2B was not acting on behalf of Alco.

*Id*. at 899-900.

The Sixth Circuit also concluded that other factors "tended to show" otherwise:

On the other hand, several factors tend to support the conclusion that B2B did in fact act on Alco's behalf. As an initial matter, Gajdos testified during his deposition about the relationship between Alco and B2B. Siding's counsel at that time asked Gajdos whether B2B "actually sent any faxes on behalf of [Alco]." Gajdos responded "Yes," and added that he knew that B2B did so because Alco "got a couple customers out of it."

Siding reads this exchange as an admission that B2B sent the faxes "on behalf of" Alco, arguing that this exchange alone is enough to render summary judgment in favor of Alco inappropriate. We agree that this exchange is probative, but Siding exaggerates the extent of its importance. The phrase "on whose behalf" is, as noted above, a legal term of art. So by asking whether B2B sent any faxes "on behalf of [Alco]," Siding's counsel essentially asked Gajdos to make a legal conclusion that—as a layperson—he was unlikely to understand. Gajdos, in other words, was probably unaware of the legal ramifications of his affirmative response, so we are unwilling to treat his answer in and of itself as sufficient to preclude summary judgment in favor of Alco.

Nonetheless, other evidence supports the conclusion that B2B did in fact act on Alco's behalf. Gajdos, for example, provided information about Alco and three "selling points" for inclusion in the advertisements that B2B prepared. Thus, even though Macaw and B2B later represented that they were "solely responsible" for the contents of the advertisements, Alco evidently did have at least some "degree of input and control," *id.* at *7, over their content.

Next, Alco reviewed and later approved the sample advertisements that B2B prepared. Alco maintains that it approved the sample advertisements on the condition that they be sent only to businesses that had previously consented to receive such advertisements. Indeed, the sample advertisements that Alco reviewed included a disclaimer stating "We will only send faxes to parties who wish to receive them." This implies that B2B deviated from Alco's approval and that B2B was therefore the entity responsible for any violations of the TCPA. Nevertheless, the fact remains that Alco at the very least was substantively involved in the preparation of the advertisements and ultimately approved their content. This factor thus supports a finding that B2B was acting "on behalf of" Alco. *See id.* (citing the "approval of the final draft of the fax(es)" as a relevant consideration).

Alco, moreover, does not dispute that the advertisements in this case promoted its services. This fact, as discussed earlier, is not sufficient to impose strict liability on Alco. *See* Part II.B.1. above. But "the actual content of the fax(es)" is nonetheless a relevant consideration, *see Cin-Q Auto.,* 2014 WL 7224943, at *7,

24

and the fact that the advertisements did promote Alco's business thus weighs in favor of a finding that they were sent on Alco's behalf. *See, e.g., Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,* 781 F.3d 1245, 1258 (11th Cir. 2015) (finding significance in the fact that the advertisement at issue "promot[ed] [the defendant's] services"). Indeed, Gajdos himself testified that Alco obtained several customers from B2B's fax campaign, so Alco's desire to advertise its services seems to have played at least some role in the origin of the allegedly unlawful conduct in this case.

Finally, the district court in ruling on a motion for summary judgment or a jury assessing the evidence at trial may take into account the reasonableness of Alco's reliance on B2B's representations that B2B would be solely responsible for the contents of the advertisements and that the faxes would be sent only to businesses that had previously consented to receive fax advertisements from B2B. The goal, after all, is to determine "the source of the offending behavior that Congress intended to curtail." *Palm Beach Golf Ctr.*, 781 F.3d at 1257. Alco's efforts to determine whether it was dealing with a reputable company or with a fly-by-night outfit is therefore a relevant factor for the court or a jury to consider.

*Id.* at 901.

But the Sixth Circuit did not rule that an issue of fact existed for trial on this issue, nor did it rule in favor of either party on the issue. Rather, it stated:

Based on the foregoing, a remand is required for the district court to apply the correct legal standard. The court in doing so may allow further discovery to determine whether, under that standard, a genuine dispute regarding any material fact exists, and the court may in any event conduct such further proceedings as it determines is necessary to effectuate the standard described above. In addition, the court should reconsider whether, after conducting such proceedings, Siding's motion for class certification remains moot.

*Id.* at 901.

Thus, the panel was suggesting that the district court reopen discovery, so that the parties could obtain discovery on the various factors they had outlined.

Here, however, we have a situation wherein some persons involved could not be deposed in this action despite efforts to do so (e.g., Abraham), some persons directly involved are now deceased (ie., Brundage, who actually paid for and authorized the fax blasts), some persons who

may have been involved are unknown (e.g., Wilson and Busch whose names appear in documents but there is no evidence as to who they worked for), and others have already been deposed and have exhausted their memories (e.g., Stephens and Kahn). So this Court does not believe that "reopening discovery" in this 2009 case would accomplish anything, and no party has requested that the Court reopen discovery.

Accordingly, this Court will proceed by analyzing the liability issue, based on the evidence that has been presented by the parties.

**A.      Defendant Charity Marketing, LLC**

As to Defendant Charity Marketing, LLC, there is simply no evidentiary basis for imposing liability against that entity. It appears that Plaintiff's Counsel may have sued the wrong entity, suing "Charity Marketing, LLC" rather than the "Charity Marketing Services, LLC" identified in Abraham's Declaration.

Plaintiff and the Class cannot establish liability against Charity Marketing, LLC based upon the evidence presented by the parties. Plaintiff's own evidence, Abraham's Declaration, identifies "Charity Marketing Services, LLC" – not "Charity Marketing, LLC" as the second entity that hired B2B to send the fax ads at issue in this case. (D.E. No. 139-5 at Pg ID 5446-47). In addition, the check that Plaintiff's Counsel directs this Court to was issued by Charity Marketing Services, LLC, not by Charity Marketing, LLC.

The Court concludes that Defendant Charity Marketing, LLC is entitled to summary judgment in its favor, as to the claims asserted against it by Plaintiff and the Class.

**B.      Defendant Richard Stephens**

Next, the Court considers whether there is any basis for imposing liability against

26

Stephens for the TCPA claims in this action.

Plaintiff's complaint names Richard Stephens, an individual, as a Defendant in this action, alleging:

> On information and belief, STEPHENS approved, authorized and participated in the scheme to broadcast advertisements by facsimile by (a) directing a list to be purchased or assembled; (b) directing and supervising employees or third parties to send the advertisements by fax; (c) creating and approving the form of advertisements to be sent; (d) determining the number and frequency of the facsimile transmissions; and (e) approving or paying the employees or third parties to send the advertisements by facsimile transmission.

(Compl., D.E. No. 1, at Pg ID 3).

At oral argument, Plaintiff's Counsel acknowledged that the Sixth Circuit has not issued any decisions that support Plaintiff's position that Stephens can be held personally liable for any faxes sent out on behalf of either of the corporate Defendants in this case.

Several district court decisions have noted that the Sixth Circuit "has yet to discuss the issue of whether individual owners, shareholders, or employees of corporations may be held liable for alleged violations of the TCPA" but several district courts "that have addressed the personal-liability issue have concluded that individuals acting on behalf of a corporation may be held personally liable for violations of the TCPA where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'" *Sandusky Wellness Center, LLC v. Wagner Wellness, Inc*., 2014 WL 1333472 at * 3 (N.D. Ohio 2014) (citation omitted); *see also Van Sweden Jewelers, Inc*., 2012 WL 4074620 at * 8 (W.D. Mich. 2012); *Jackson Five Star Catering, Inc*., 2013 WL 5966340 at * 4 (E.D. Mich. 2013).

Stephens's Declaration states, "I personally had no knowledge of and nothing to do with the fax campaign at issue in this lawsuit." (*Id*. at ¶ 17).

Plaintiff has not produced any evidence that could establish that Stephens had "direct, personal participation in or personally authorized the conduct" that violated the TCPA in this case. Indeed, Plaintiff's own evidence, the Declaration from Abraham, asserts that MFC acted through others, "Joseph Busch and Julia Kahn" and makes no reference to any involvement or approval by Stephens.

Given this lack of evidence, Stephens is entitled to summary judgment in his favor, as to Plaintiff and the Class.

### C.       Defendant MFC

That leaves the claims (by the named Plaintiff and the Class) asserted against the remaining Defendant, MFC.

The Court must consider whether Plaintiff could present sufficient evidence at trial to establish that the two fax ads at issue in this case were sent "on behalf of" Defendant MFC.

### 1.       Fax Ad Two

Again, the sole named Plaintiff in this class action received only one fax ad and that was Fax Ad Two. In addition to the above arguments about Stephens and Charity Marketing, LLC, this Court fails to see how Plaintiff or the Class could possibly establish that any of the three Defendants named in this action are liable for Fax Ad Two, the one that was sent to Compressor.

In order to establish liability at trial, Plaintiff has to show that Fax Ad Two was "sent on behalf of" Defendants. That consideration looks at whole host of things, including: 1) the actual content of the faxes; 2) the degree of input or control over the content of the faxes; 3) evidence

regarding payment for the faxes; and 4) overall awareness of the circumstances (including access to and control over facsimile lists and transmission information).  As to Fax Ad Two, we have the following undisputed evidence:

- An entity other than the three named Defendants (Charity Marketing Services, LLC) paid for and gave final authorization for the fax ads at issue in this case to be sent out.

- None of the three named Defendants are named, or referenced in any way, in the body of Fax Ad Two.

- The phone number that Fax Ad Two features, and prompts it audience to call, is not a phone number that belonged to Defendants.

- Fax Ad Two expressly states "This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Bue, Rom, 050183, 40723294564, which is solely responsible for its contents and destinations."  (*Id*.).

Given those undisputed facts, this Court fails to see how a reasonable jury could conclude that Fax Ad Two was sent "on behalf of" any of these three Defendants, including MFC.

This Court therefore concludes that Defendants are entitled to summary judgment in their favor with respect to all claims (Compressor's own individual claim and the claims of the Class) relating to Fax Ad Two.[3]

### 2. Fax Ad One

Even if the named Plaintiff had received Fax Ad One, the Court concludes that Plaintiff cannot produce sufficient evidence at trial such that a reasonable jury could conclude that Fax Ad One was sent "on behalf of" Defendant MFC.

Plaintiff has a somewhat stronger position as to Fax Ad One, because Defendant MFC is

---

[3]Notably, Compressor is the sole named Plaintiff in this class action.  If Compressor's individual claim is dismissed, then there would be no class representative who could proceed in this action and pursue claims relating to Fax Ad One.

at least identified in the body of the fax ad.  But the rest of the evidence is essentially the same as that for Fax Ad Two, and collectively does not support a conclusion that the ad was sent on behalf of MFC.

Plaintiff has not produced any evidence of a contract between B2B/Macaw/Maxileads and MFC. Thus, there are no "nature and terms" of such a contractual relationship for the Court to evaluate.

There is no evidence that anyone acting on behalf of MFC approved the final draft of the fax ads, paid for them, or authorized the faxes to be sent.  To the contrary, the undisputed evidence indicates that a third-party entity (Charity Marketing Services, LLC), which is not a party to this case, paid for and gave final authorization for the fax ads at issue in this case to be sent out.

There is no evidence to establish that Stephens, or anyone else at MFC, authorized Brundage or Charity Marketing Services, LLC to hire B2B, Maxileads, or Macaw.

While Plaintiff produced some correspondence documents that list the name of "Julia Kahn," Plaintiff cannot produce any witnesses at trial who could testify that Kahn helped prepare, draft, or revise the fax ads at issue in this case.  And Kahn testified that Stephens did not ask her to communicate or interact with marketing or advertising companies for MFC (and that he would not have done so given her language issues), that she has no recollection of having communicated with B2B, Maxileads, or Macaw, and that she does not even know if MFC engaged in any fax advertising.

Moreover, Fax Ad One itself expressly states "This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Bue, Rom, 050183, 40723294564, which is solely

responsible for its contents and destinations."

Another relevant factor identified by the Sixth Circuit is the "overall awareness of the circumstances (including access to and control over facsimile lists and transmission information)." *Siding and Insulation*, 822 F.3d at 899. Here it is undisputed that: 1) B2B sent the faxes at issue in this case to "fax numbers generated through a target list acquired by B2B from a third-party vendor, InfoUSA." (D.E. No. 139 at Pg ID 5329); 2) "Defendants did not provide B2B with the list of contacts to receive the fax advertisements," 3)"Defendants did not create the list of fax ad recipients." (*Id.*); and 4) that was all done by Abraham/B2B and/or Macaw. (*Id.*; Abraham Decl., D.E. No. 139-7 at Pg ID 5505). It is also undisputed that B2B – the entity whose entire business was dedicated to performing fax-blast advertising services for others – "did not contact Plaintiff or any companies or persons on the InfoUSA list for express permission or invitation to received fax advertisements." (D.E. No. 139 at Pg ID 5329).

Given the collective evidence in this record, this Court fails to see how a reasonable jury could conclude that Fax Ad One was sent "on behalf of" Defendant MFC such that it can be held liable under the TCPA.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED as to all claims asserted by Plaintiff and the Class.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 13, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on

September 13, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager